# Richmond

## CITY OF ALEXANDRIA, EMPLOYER, ETC. v. CLARENCE J. McCLARY (DECEASED), EMPLOYEE, ETC.

November 12, 1936.

Present, All the Justices.

The opinion states the case.

*Sinnott & May* and *Virgil P. Randolph, Jr.*, for the appellant.

*Frederick L. Flynn*, for the appellee.

HOLT, J., delivered the opinion of the court.

This is an appeal made from an award made by the Industrial Commission of Virginia. Clarence J. McClary, a police officer of the city of Alexandria, was killed on March 17, 1935, under these conditions:

On the preceding day, Saturday, March 16th, Mr. Saunders of the Alcoholic Beverage Control Board, speaking from Leesburg in Loudoun county, called up Capt. J. S. Arnold, chief of police of the city of Alexandria, and said that there was trouble in their attempt to arrest one who had shot a federal agent. Saunders asked Arnold to come with men properly armed to his assistance. Arnold replied that such a call would have to come from the sheriff. Such a call did come and this chief with policemen, Hawes and Curtis, went to Leesburg, not then accompanied by McClary, and found there both State and federal officers engaged in this manhunt. Their force seemed to be sufficient and Arnold at his request was told that he and his force might return to Alexandria. They did return. About twelve o'clock that night he was again called up by Sheriff Adrian and was told that his services were again needed. McClary was then at police headquarters. Adrian started to make a list of those who were to accompany him. All of his officers were willing to go so this list was not completed. He said to them "as many as want to go meet me here at three-thirty." They met, armed, McClary among them, at that hour, and in response to the call which had been made went back to Leesburg, where they

were sworn in as deputies by the sheriff of Loudoun county. Search was then made, which was at first without results. Afterwards McClary and some of his associates said that they would like to go over and look at the still which the fugitive, Quesenberry, had been operating. They did go, and it was there that McClary was shot and killed. It is not perfectly clear who was in general charge of the search. It was either a federal officer, Sheriff Adrian, or Mr. Saunders of the A. B. C. Board. But these Alexandria policemen went at the call of and with Chief of Police Arnold, who was their immediate commanding officer. Upon return of these city policemen to their home, report was made to the city manager of Alexandria as to what had been done, and on March 26, 1935, the city council of Alexandria adopted this resolution introduced by the mayor:

"Whereas, in responding to the call of duty, and in line of duty, Corporal Clarence McClary of our Police Department gave his life in the suppression of crime and in carrying out his duties as an officer,

"Therefore Be It Resolved, by the City Council of Alexandria, that we extend to the Widow and Children of the Late Clarence McClary the sympathies and condolences of the City of Alexandria, and

"Be It Resolved Further, that the name of Corporal Clarence McClary be kept on the payroll of the Police Department of the City of Alexandria at full salary, and that said salary be paid to the widow of this officer, until such time as proper provisions are made for the care and maintenance of his family either by the Federal Government, or the State of Virginia, or Loudoun County, or further action of Council."

McClary left a widow and four infant children. She is the claimant here, city of Alexandria was the employer, and the Maryland Casualty Company was the insurance carrier.

This claimant was awarded $14 a week for three hundred weeks beginning March 17, 1935, subject to such modifications as subsequent conditions might require. This award was for the joint benefit of herself and her children. An at-

torney's fee for $475 was allowed "to be deducted from the compensation awarded." Burial expenses not to exceed $150 were also allowed.

By act approved August 7, 1935, by Private Bill, No. 194, 74th Congress H. R. 6825, 49 Stat. ———, Congress gave Mrs. McClary $75 a month, in no event to exceed $10,000; said allowance to be in full settlement for all claims against the federal government.

Capt. Arnold was questioned as to custom and testified as follows:

"Q. Have you ever taken your men outside of the City before on any emergency occasion?

A. We are out of the City practically every day.

Q. In the adjacent counties of the Commonwealth, you will co-operate with them?

A. In Northern Virginia and throughout the territory surrounding the City of Alexandria.

Q. Was a Crime Conference held which you attended?

A. A Crime Conference was called by the President of the United States and presided over by the Attorney General, in which they advocated co-operation between local, State and Federal and all law enforcement bodies.

Q. Your police officers are state officers?

A. We are given the State oath when we take the oath.

Q. To enforce the laws of the State of Virginia as well as the laws of Alexandria?

A. That is my understanding."

This custom McClary must have known. He said to his wife as he left for Leesburg, "When a man tells you to go you have to go."

Plainly McClary's death occurred in the course of his employment. That it did or did not rise out of it is debatable. As between them is there any causal connection?

In our approach, this cardinal rule of construction is always to be remembered. "The Workmen's Compensation Act (Acts 1918, chapter 400, page 637), although in derogation of the common law, is highly remedial, and should be liberally construed in favor of the workman." *Gobble* v.

*Clinch Valley Lbr. Co.*, 141 Va. 303, 127 S. E. 175, 176; *Bristol Builders Supply Co.* v. *McReynolds*, 157 Va. 468, 162 S. E. 8.

A policeman is a State and not a municipal officer (*Burch* v. *Hardwicke*, 30 Gratt. (71 Va.) 24, 32 Am. Rep. 640; *Mann* v. *City of Lynchburg*, 129 Va. 453, 106 S. E. 371), although the city selects him, employs him, and pays his salary.

The power of a policeman to make an arrest by virtue' of his office is subject to well recognized territorial limits. He can act only within his city or within one mile of its corporate limits. Code, sections 2822, 2991, and section 3006, as amended by Acts 1930, chapter 395; *McNeale* v. *Governor*, 3 Gratt. (44 Va.) 286; *McClannan* v. *Chaplain*, 136 Va. 1, 116 S. E. 495; 57 C. J. 775; 2 R. C. L. page 469; 19 R. C. L. page 796; Horton's Crim. Law (11th Ed.) section 544. A Staunton policeman who, without more, went to Cape Charles and undertook to make an arrest, would have no standing by virtue of his office. His status would be that of any other private citizen, and no liability would rest upon Staunton for anything which he undertook to do in that distant political subdivision of the State. He is a State officer whose powers are territorially limited.

Since he is a State officer, the relationship of master and servant under the general law does not exist, and we so held in *Mann* v. *City of Lynchburg, supra*. That case was decided in March, 1922. Acts of General Assembly, 1922, chapter 425, page 741, amended the Workmen's Compensation Act (Acts 1918, chapter 400, section 2, subsection (b)). That amendment in part provides that "Policemen and firemen, except policemen and firemen in cities containing more than one hundred and seventy thousand inhabitants, shall be deemed to be employees of the respective cities, counties or towns in which their services are employed and by whom their salaries are paid." This act did not extend the jurisdiction of policemen, but it established between them and their cities the relation of master and servant. If that were all, plaintiff still could not recover for her decedent

was injured outside of what might be considered the general scope of his employment, but that is not all of this particular case. As we have seen, it was an every day custom of the city to send its policemen into adjacent territory for the purpose of preserving order there. This was a custom which McClary knew and acquiesced in. On the occasion of his death he said to his wife that it was his duty to go. He was not a volunteer and as the Commission well said would probably have been discharged had he failed or refused to go. That he did die in the line of his duty the city recognized by resolution of the city council in its expressions of sympathy, which tells that he "gave his life in the suppression of crime and in carrying out his duties as an officer." This was not a duty imposed by any rule of general law. It was not a duty which rests upon a policeman as such but upon the ordinary relationship of master and servant expressly imposed by statute, recognized and accepted by the master and by servant and ratified, if needs be, by a custom known to both of them. Custom alone may impose additional liabilities. *Chesapeake & Ohio Ry. Co.* v. *Golladay*, 164 Va. 292, 180 S. E. 400. It is still true, however, that policemen who, on their own initiative, wander abroad and undertake to make arrests by virtue of their office, do so at their peril.

Those authorities which deal with the loan of an employee have no application. This policeman, with his associates, was always under the immediate control of his chief and unquestionably would have returned to Alexandria whenever ordered to do so by him.

Section 37, subsection (b), of the Workmen's Compensation Act (Acts 1918, chapter 400), provides that "if an employee shall receive compensation or damages under the laws of any other State, nothing herein contained shall be construed so as to permit a total compensation for the same injury greater than is provided for in this act."

We may readily concede that the federal government is a State within the meaning of this act, but it was under no obligation to make provisions for the protection of decedent's family, although the language of the act cited *supra,*

literally construed, might lead to that conclusion. Since there was no liability, provisions made were but a gift to the widow. "Compensation," "damages," and "gratuity" are not synonyms, so this gift from the general government cannot be set off as against a right to recover.

For reasons stated, the findings of the Industrial Commission of Virginia should be upheld, and it is so ordered.

*Affirmed.*